UNITED STATES  DISTRICT COURT

For the Northern District of California

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| AMIT PATEL, on behalf of himself and all others similarly situated,<br><br>                  Plaintiffs,<br><br>         v.<br><br>TRANS UNION, LLC in its own name and t/a TRANS UNION RENTAL SCREENING SOLUTIONS, INC. and TRANSUNION BACKGROUND DATA SOLUTIONS, and TRANS UNION RENTAL SCREENING SOLUTIONS, INC. in its own name and t/a TRANSUNION BACKGROUND DATA SOLUTIONS,<br><br>                  Defendants.<br>_____ | No. 3:14-cv-00522-LB<br><br>ORDER CERTIFYING RULE 23(b)(3) CLASS<br><br>[ECF Nos. 56-4, 60] |

**INTRODUCTION**

Plaintiff Amit Patel applied to rent an apartment. Trans Union Rental Screening Solutions, Inc. performed a background report, which reported (inaccurately) that Mr. Patel was on a terrorist watch list. (Amended Complaint, ECF No. 41, ¶¶ 56-62.[1]). The search function that generated the terrorist "alert" used only Mr. Patel's name (and not other identifying information such as a social security number). (*Id.* ¶¶ 50-52.) Mr. Patel later requested his file from Trans Union, LLC, but the disclosure

_____

[1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page numbers at the tops of document; citations to depositions are to the deposition page numbers.

1    did not contain the background check or the alert. (*Id.* ¶ 74.) On behalf of himself and the class, Mr.

2    Patel sued Trans Union Rental Screening Solutions and its parent Trans Union, LLC, alleging that

3    they — operating as a single credit-reporting agency — violated the federal Fair Credit Reporting Act

4    ("FCRA"). (*Id.* at 1-22.) He moves for class certification under Federal Rule of Civil Procedure

5    23(b)(3) for two classes and two claims: (1) a national class challenging the defendants' willful

6    failure to maintain and follow reasonable procedures to ensure the maximum possible accuracy of

7    their information, in violation of 15 U.S.C. § 1681e(b), and (2) a national subclass challenging the

8    defendants' willful failure to provide consumers with all information in their files, in violation of 15

9    U.S.C. § 1681g. (Motion, ECF No. 59-4 at 6, 18-26.[2]) The court grants the motion and certifies the

10   two classes.

**STATEMENT**

## I. MR. PATEL'S CREDIT REPORT

13        In July 2013, Mr. Patel applied to rent an apartment in Union City, California from CBC Realty.

14   (Amended Complaint, ECF No. 41, ¶ 56.) CBC contracted with Trans Union Rental Screening

15   Solutions to use the SmartMove background-check product to evaluate applicants for residential

16   leases. (*Id.* ¶ 57.) The product gives subscribers such as CBC a customized credit recommendation

17   and a national background search about the applicant. (*Id.* ¶ 58.) It also provides subscribers with (1)

18   a recommendation about the applicant (based on criteria provided by the subscriber) and (2) a letter

19   with reasons an applicant was or was not approved for a lease. (*Id.* ¶ 59.)

20        As part of the rental-application process, CBC required Mr. Patel to access the SmartMove

21   website to provide information and authorization for CBC to obtain a SmartMove report about Mr.

---

[2] The complaint named TransUnion Rental Background Data Solutions as a defendant and also alleged that Trans Union Rental Screening Solutions traded under that name; it also claimed a violation of the FCRA for (inaccurate) criminal records on the background check and several violations of the California Consumer Credit Reporting Agencies Act ("CCCRAA"). (Amended Complaint, ECF No. 41, ¶¶ 1-2, 89-91, 94-97.) The class-certification motion discusses only the parent Trans Union, LLC and the subsidiary Trans Union Rental Screening Solutions, and it limits the relevant claims to the two willful violations of the FCRA alleged in claims one and claim six (misnumbered five) in the complaint. (Motion, ECF No. 59-4 at 6; *see* Amended Complaint, ECF No. 41, ¶ ¶87-88; 98-99.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Patel. (Patel Dep., ECF No. 56-25, at 31.) Then, on July 16, 2013, CBC applied "through

2    SmartMove" for information about Mr. Patel's rental application (and paid a fee), and that same day,

3    it received "a Trans Union [SmartMove] consumer report purportedly about" Mr. Patel. (Amended

4    Complaint, ECF No. 41, ¶¶ 60-61.) The report was inaccurate. (*Id.* ¶ 62.) It said that Mr. Patel had 17

5    criminal records from New Mexico and Rhode Island, but these records do not belong to him, and he

6    has never been to these states. (*Id.* ¶ 63.) It referred to Mr. Patel's 2008 misdemeanor DUI, but a

7    California court vacated that offense by order dated July 24, 2012 (a year earlier). (Id.¶ 64.) It said

8    that Mr. Patel was a "Terrorist" from Charlotte, North Carolina, and he is not a terrorist and has never

9    been to North Carolina. (*Id.* ¶ 62.) The report does not identify the source of the terrorist alert about

10   Mr. Patel. (Patel Report, Ex.1 to Motion, ECF No. 56-7 at 4; Colaprete Dep., Ex. 5 to Motion, at 86-

11   87, 99-100). In fact, it came from a third-party data provider. (*Id.*) That provider obtained the data

12   from the U.S. Officer of the Comptroller of the Currency ("OCC"), which enforces federal banking

13   regulations such as the anti-money-laundering provisions of the Bank Secrecy Act, 31 U.S.C. §§

14   5311-5330, which are aimed at deterring and disrupting terrorist financing networks. (*Id.* at 87;

15   Motion, ECF No. 59–4 at 15-16.) The gist is that Trans Union, LLC can say only that the terrorist

16   alert about Mr. Patel came from an OCC data set. (ECF No. 59-4 at 16, citing Colaprete Dep. at 100.)

17        Through the SmartMove product's "automated programing and process," SmartMove notified

18   CBC that it should reject Mr. Patel's rental application, and "[s]olely based on the inaccurate

19   information" in the report, CBC denied Mr. Patel's rental application. (Amended Complaint, ECF

20   No. 41, ¶ 66.) Trans Union, LLC counters that CBC rejected Mr. Patel for reasons unrelated to the

21   credit report, including the length of his current job (two months) and inability to verify the length of

22   his previous job. (Opposition, ECF No. 69-5 at 13-14 (citing Lau Dep., ECF No.70-4 at 22-3; 46,

23   49).)

24        After CBC rejected his rental application, it gave Mr. Patel a copy of the SmartMove Report.

25   (Patel. Dep., ECF No. 56-25 at 74-76.) (It was not available to Mr. Patel through SmartMove. (*See*

26   Amended Complaint, ECF No. 41, ¶ 67.)) Mr. Patel identified and contacted Trans Union Rental

27   Screening Solutions to get a copy of the report, but he did not get it. (Patel Dep., ECF No. 56-25 at

28   64-65.) Specifically, on July 22, 2013, he sent an email saying, "I would like a full report of my

UNITED STATES DISTRICT COURT
For the Northern District of California

1   criminal background check. All of it is false . . . ." (ECF 56-17.) Trans Union Rental Screening

2   Solutions Customer Service (identified in the email's "From" line as "TURSS Customer Service")

3   responded with some information on how records were pulled, then told him (1) how to get his Trans

4   Union LLC credit report (via phone or at www.annualcreditreport.com) and (2) how to get his

5   background check (by submitting his government id and other identifying information to Trans Union

6   Rental Screening Solutions), and ended by saying "Thank you for choosing TransUnion

7   SmartMove." (*Id.*) (Mr. Patel says that he sent the information for the background check, and Trans

8   Union Rental Screening Solutions says that it has no record of receiving it. (Patel Dep., ECF No. 70-5

9   at 68; Armbruster Dep., ECF No. 70-8 at 88-89.) On July 25, 2013, Mr. Patel's lawyer wrote a letter

10  to Trans Union Rental Screening Solutions disputing the inaccurate information, and she asked for

11  the information that had been reported, but no one responded. (Amended Complaint, ECF No. 41, ¶

12  75; Letter, Ex.18 to Motion, ECF No. 56-30.) Trans Union Rental Screening Solutions says that it has

13  no record of receiving this letter either. (Armbruster Dep., ECF No. 70-8 at 88.) Mr. Patel obtained a

14  Trans Union, LLC credit report through "the online portal" on July 22, 2015, but it did not contain

15  the inaccurate information. (Request, ECF No. 16, ECF No. 56-28; Report, Ex. 17, ECF No. 56-29;

16  Amended Complaint, ECF No. 41, ¶ 73-74.)

17                                          *  *  *

18  **II. SMARTMOVE AND TRANS UNION, LLC REPORTS**

19      The SmartMove reports include criminal-record information, other public-record information

20  (*e.g.*, eviction records), and terrorist-alert information. (Opposition, ECF No. 69-5 at 12.) The

21  terrorist alerts on the SmartMove product come from different federal law-enforcement databases

22  (e.g., the FBI and Secret Service), the Office of Foreign Assets Control ("OFAC") list, and other

23  international, U.S., and foreign government lists. (*Id.*; Motion, ECF No. 59-4 at 12 & Ex.11.) As

24  described in the previous section, the source for the data is a third-party vendor, which in turn gets

25  the data from the government agencies; the data thereafter is stored on a database on a Trans Union,

26  LLC server. (Ex. 11; Colaprete Dep., Ex. 5 at 48-49; Klassen Dep., Ex. 3 to Motion, at 48-50, 52-53.)

27      To generate a SmartMove report about a person, a computer program queries databases for a

28  "match." (Klassen Dep. at 67-68.) Until December 2013, the "matching criteria" for including a


terrorist alert on a SmartMove report were based only on the person's first and last names. (Colaprete Dep., Ex. 5 at 76, 81-82.) There are no steps beyond this "name only" logic to verify that the "hits" from the records relate to the person who is the subject of the background check. (Motion, ECF No. 59-4 at 13.) At different times, different headings in the SmartMove report described the "alert" records: (1) from February 2012 to August 2012, the heading was "Terrorist;" (2) starting in August 2012, the heading changed from "Terrorist" to "Potential OFAC Hit;" (3) sometime before July 2013 (the date of Mr. Patel's report) the heading "inadvertently" reverted to the "Terrorist" heading; and (4) from October 2013 to December 2013, the heading reverted to "Potential OFAC Hit." (Colaprete Decl., ECF No. 70-3, ¶¶ 5-10.)

A landlord reviews a SmartMove report online and can use hyperlinks to access additional pages with more detail. (Opposition, ECF. No. 69-5 at 12-13 (record citations omitted).) A frequently asked question on the SmartMove website is as follows:

**Can I get a copy of the credit report provided to the landlord?**

No. Only the landlord is allowed access to the TransUnion SmartMove credit report. As an alternative, we suggest the renter go to www.annualcreditreport.com to get a copy of their TransUnion credit report.

*See* https://www.mysmartmove.com/SmartMove-FAQs/renter-faq.html#q13.

(Amended Complaint, ECF No. 41, ¶ 67.) If consumers request a credit report from Trans Union, LLC, Trans Union LLC does not include the SmartMove report in the disclosure. (Litwa Dep., ECF No. 56-19 at 116-117.)

* * *

**III. THE TRANS UNION ENTITIES**

The Amended Complaint alleges that Trans Union Rental Screening Solutions and its parent Trans Union, LLC operate as a single consumer-reporting agency under the FCRA. (Amended Complaint, ECF No. 41, ¶ 1.) The defendants contend that each entity is a separate consumer-reporting agency. (Opposition, ECF No 69-5 at 10.)

**A. The Plaintiff's Version**

The complaint names the defendants: "Trans Union, LLC, in its own name and trading as Trans Union Rental Screening Solutions, Inc., and Trans Union Background Data Solutions, as well as

UNITED STATES DISTRICT COURT
For the Northern District of California

Trans Union Rental Screening Solutions, Inc. in its own name and trading as Trans Union Background Data Solutions (together, 'Defendants' or 'Trans Union')". (ECF No. 41, ¶ 6.) It alleges that "Trans Union, LLC has structured itself so as to warehouse its sale of credit[-]reporting consumer reports in one entity and its sale of criminal history (employment and landlord-tenant purposed) consumer reports in a second entity. However, it freely transfers data between units and operates without any impediments of corporate structure. In almost every regard, the above Defendants operate as if they are one and the same, a single 'consumer reporting agency.'" (*Id.* ¶ 1.)

"Trans Union claims that it can offer paying customers '[a] database of more than 200 million files, which profile nearly every market-active consumer in the United States.' http://www.Trans Union.com/corporate/business/solutionsbyneed.page?." (*Id.* ¶ 7.) Its "best known product is conventional credit[-]reporting," and its "'database contains information provided by more than 85,000 credit-granting institutions and is updated, audited and monitored on a regular basis.' http://www.Trans Union.com/corporate/business/solutionsbyneed/credit-reporting.page?" (*Id.* ¶ 8.)

The complaint elaborates that Trans Union, LLC markets the SmartMove product:

> For its tenant screening business, Trans Union markets its services as follows:
>
> Whether you have a couple hundred units or just one, you now have access to the same tenant screening used by the largest property management companies. It's all online in a solution designed to fit your needs.
>
> Trans Union SmartMove gives you all the tenant screening tools you need with none of the hassle including long approval processes or minimum use requirements.
>
> • Credit report and criminal history
> • Leasing recommendation
> • Suggested deposit amount
> • Joint recommendation for multiple tenants and co-signers
> • No paperwork or long approval process
> • Use it only when you need it and pay as you go
> • Landlord decides who pays for the service
>
> *See* http://www.Trans Union.com/corporate/business/propertymgt/independent-rental-owners.page

(*Id.* ¶ 10.) It also markets its data reselling business:

> **Background Data Resellers**
>
> With one of the world's largest privately maintained criminal databases, Trans Union

UNITED STATES DISTRICT COURT
For the Northern District of California

Background Data Solutions helps you offer higher-quality data to expand your profit margin. Access more than 1 billion criminal and eviction records updated weekly from more than 400 data sets across the country.

*See* http://www.Trans Union.com/corporate/business/solutionsbyneed/data-resellers.page.

(*Id. ¶* 11.) The complaint further describes how on this web landing page (bearing the Trans Union.com address), Trans Union, LLC explains and markets how customers can access instant criminal and eviction history databases and promotes the business. (*Id. ¶¶* 13-15.)

Trans Union Rental Screening Solutions is a wholly owned subsidiary of Trans Union, LLC, and it produces and sells the SmartMove reports. (Ex. 2 to Motion, ECF No. 59-4.)

At the class-certification stage, no merits discovery has been taken. (Motion, ECF No. 59-4 at 8 n.9.) But so far, the plaintiff has identified Trans Union, LLC's "substantial involvement" in Trans Union Rental Screening Solution's operations, including the following:

- Owning and maintaining the computers where public-record data and terrorist records are stored. (Klassen Dep., Ex. 3, at 52-53.)

- Providing centralized technical support to all of its subsidiaries (including Trans Union Rental Screening Solutions). (*Id.* at 12-13.)

- Marketing SmartMove as a Trans Union, LLC product and stamping its copyrights and trademarks on documents related to SmartMove. (Exs. 1, 4; *see* Amended Complaint excerpts, *supra*.)

- Providing compliance functions through Trans Union, LLC for Trans Union Rental Screening Solutions (including auditing accuracy procedures, including analysis of SmartMove reports). (Colaprete Dep., Ex. 5 to Motion, at 8-11.)

- Directing consumers to send correspondence regarding SmartMove reports to a Trans Union, LLC facility, where Trans Union, LLC employees do an initial review, and exercising continuous oversight. (Armbruster Dep., ECF No. 56-18 at 94-96; Litwa Dep., ECF No. 56-19 at 83-84, 113-114; Ex. 10 at TURSS00000324.).

(*See* Motion, ECF No. 59-4 at 9-10 (making these points).)

\* \*

**B. The Defendants' Version**

The companies are separate companies with distinct products: Trans Union Rental Screening Solutions sells background reports, including the SmartMove product, to landlords and other property owners, and Trans Union, LLC sells traditional credit reports that primarily contain information from credit grantors. (Opposition, ECF No. 69-5 at 10-11 (record cites omitted).) Trans Union Rental

Screening Solutions is a separate but wholly owned subsidiary; the companies operate in different facilities and locations; they maintain separate corporate, financial, and accounting records; and they maintain their corporate data separately. (*Id.* at 10 n.2 (record cites omitted).) They maintain their consumer data separately, and neither party has unrestricted access to the other's data. (*Id.* at 11 (record cites omitted).) Trans Union, LLC provides limited data-hosting to Trans Union Rental Screening Solutions but does not have access to data "beyond these narrow [] purposes." (*Id.*) Trans Union Rental Screening Solutions maintains access controls over who has access to its data, and that prevents Trans Union, LLC from exporting the data or accessing it unless necessary for purposes related to Trans Union Rental Screening Solutions. (*Id.*) They do not have common access to each other's documents and data. (*Id.*) Trans Union, LLC includes some alert information in its credit reports, but it does not contain criminal records or criminal history. (*Id.*) Its third-party vendor for alert information is Accuity, and Trans Union Rental Screening Solutions uses a different vendor (identified in Ex. 11, Motion). (*Id.*)

The Consumer Finance Protection Bureau ("CFPB"), the independent government agency with primary authority to enforce the FCRA, publishes a list of consumer-reporting agencies ("CRA"). (*Id.* at 10.) Its list as of January 1, 2015 lists Trans Union, LLC as one of the three largest nationwide providers of consumer credit reports, and it lists Trans Union Rental Screening Solutions "among the smaller CRAs" that provide "'tenant screening services.'" (*Id.*, citing the CFPB website.)

* * *

## IV. THE CLAIMS

The complaint asserts seven claims against the defendants: (1) willfully failing to provide consumers with information in their files, in violation of the FCRA, 15 U.S.C. § 1681g, (2) failing to provide California consumers, upon request, with a copy of their disclosure with all information on the consumer, in violation of the CCCRAA, Cal. Civ. Code §§ 1785.10 & 1785.15, (3) negligently and willfully failing to maintain reasonable procedures to assure the maximum possible accuracy of consumer reports by including inaccurate public records, in violation of the FCRA, 15 U.S.C. § 1681e(b), (4) failing to follow reasonable procedures to assure the maximum possible accuracy of the reports it sold, in violation of the CCCRAA, Cal. Civ. Code § 1785.14(b), (5) reporting public

UNITED STATES DISTRICT COURT
For the Northern District of California

1  records without including the specific source of information and the date the information was

2  reported, in violation of the CCCRAA, Cal. Civ. Code § 1785.18, (6) negligently and willfully failing

3  to maintain reasonable procedures to establish the maximum possible accuracy of consumer reports

4  by selling background reports inaccurately identifying consumers as terrorists, in violation of the

5  FCRA, 15 U.S.C. § 1681e(b), and (7) negligently and willfully failing to conduct a reasonable

6  investigation into the completeness and accuracy of the information disputed by Mr. Patel, in

7  violation of the FCRA, 15 U.S.C. § 1681i. (Amended Complaint, ECF No. 41, at 16-19.) Claims one

8  through six are class claims, claims three through six also are individual claims asserted by Mr. Patel,

9  and claim seven is an individual claim.(*Id.*)

10      The class-certification motion limits the claims to two "willful" FCRA claims: claims one and six

11  (misnumbered five) in the complaint. (Motion, ECF No. 59-4 at 6, 24 (proposing a national class for

12  disclosure of terrorist "alert" information and a national subclass for persons who had an "alert" and

13  thereafter requested and were sent a file disclosure; limiting claims to willful violations); Reply, ECF

14  No. 76-2 at 6-7, 15 n.5 (subclass definition).) The gist of the facts underlying the claims is that the

15  SmartMove product used a faulty procedure (a "name-only" matching logic consisting of the rental

16  applicant's first and last name) to determine whether to include a terrorist "alert" on a SmartMove

17  report sold to a third party. (Motion, ECF No. 59-4 at 7, 12-13; Amended Complaint, ECF No. 41, ¶

18  50.) The SmartMove procedure could have used other identifying information that Trans Union

19  Rental Screening Solutions had (such as date of birth and social security information) but it did not

20  use that information until approximately December 2013.[3] (Motion, ECF No. 59-4 at 6, 12-13 & n.

21  13.) It persisted in this approach "despite clear Third Circuit precedent" directed to Trans Union,

22  LLC that the use of the name-only matching logic was a willful violation of the FCRA, 15 U.S.C. §

23  1681e(b). (Amended Complaint, ECF No. 41, ¶¶ 29-32 (citing *Cortez v. Trans Union, LLC*, 617 F.3d

24  688, 711-13 (3rd Cir. 2010)); Motion, ECF No. 59-4 at 6-7.) The name-only logic is so flawed that

25  the terrorist alerts are always inaccurate. (Reply, ECF No. 76-2 at 6.) Trans Union, LLC's standard

26  disclosure to consumers "uniformly fails to disclose terrorist records" even though the FCRA, 15

27

28      [3] Starting in December 2013, the process required the social security number or date of birth to match to the alert, which dramatically reduced terrorist alerts. (Colaprete Dep., Ex. 5, at 76-80).)

1  U.S.C. § 1681g, requires that disclosure (*Id.*; Amended Complaint, ECF No. 41, ¶¶ 35, 88.)

2  **V. THE PROPOSED CLASSES**

3      The plaintiff asks to certify two national classes: an "accuracy" class and a "disclosure" subclass:

4      All natural persons residing in the United States who, from February 2012 until December
5      2013, were the subjects of Trans Union SmartMove reports containing at least one item of
       "Alert List" information.

6      All natural persons residing in the United States who, from February 2012 until December
7      2013, were the subjects of Trans Union SmartMove reports containing at least one item of
       "Alert List" information who requested a file disclosure from, and were sent a disclosure by,
8      Trans Union, LLC.

9  (Motion, ECF No.59-4 at 6; Reply, ECF No. 76-2 at 15 n.5 (adding refinement of "sent").)[4]

10      The defendants identified 11,048 SmartMove reports sent to third parties from February 2, 2012

11  to July 1, 2014, with at least one item of information in the "Terrorist Record" section. (Response to

12  Interrogatory No. 3, ECF No. 56-24 at 7.) There are "at least 8,000 reports using the name-only

13  matching criteria" from February 2, 2012 to December 2013. (Motion, ECF No. 59-4 at 17.)

14                                    *  *  *

15                        **THE FAIR CREDIT REPORTING ACT**

16      The class-certification motion seeks certification of two classes based on two willful violations of

17  the Fair Credit Reporting Act, 15 U.S.C. §§ 1681e(b) and 1681(g). The statutes are as follows:

18  **15 U.S.C. § 1681e: Compliance procedures**

19  **(a) Identity and purposes of credit users**

20      Every consumer reporting agency shall maintain reasonable procedures designed to avoid
       violations of section 1681c of this title and to limit the furnishing of consumer reports to the
21     purposes listed under section 1681b of this title. These procedures shall require that prospective
       users of the information identify themselves, certify the purposes for which the information is
22     sought, and certify that the information will be used for no other purpose. Every consumer
       reporting agency shall make a reasonable effort to verify the identity of a new prospective user
23     and the uses certified by such prospective user prior to furnishing such user a consumer report.
       No consumer reporting agency may furnish a consumer report to any person if it has reasonable
24     grounds for believing that the consumer report will not be used for a purpose listed in section

25  _____

26      [4] These definitions narrow those in the complaint to end the class period in December 2013
    and limit the subclass to those who were sent a file disclosure. (*Cf.* Amended Complaint, ECF No.
27  41, ¶¶ 78(a), 78(g).) Courts regularly allow the class definitions to be adjusted to reflect the
    developing realities of a lawsuit. *See Brown v. The Hain Celestial Group, Inc.*, No. 3:11-cv-03082-
28  LB, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014) (collecting cases).

1     1681b of this title.

2     **(b) Accuracy of report**

3     Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable
procedures to assure maximum possible accuracy of the information concerning the individual
4     about whom the report relates.

5     **15 U.S.C. § 1681g**: **Disclosures to consumers**

6     **(a) Information on file; sources; report recipients**

7     Every consumer reporting agency shall, upon request ... clearly and accurately disclose to the
consumer:

8

       (1) All information in the consumer's file at the time of the request....”
9

10     The plaintiff seeks statutory damages only, which are as follows: (Motion, ECF No. 59-4 at 24.)

11     **15 U.S.C. § 1681n**: **Civil liability for willful noncompliance**

12     **(a) In general**

13     Any person who willfully fails to comply with any requirement imposed under this subchapter
with respect to any consumer is liable to that consumer in an amount equal to the sum of—
14

15        (1)(A) any actual damages sustained by the consumer as a result of the failure or damages
of not less than $100 and not more than $1,000; or

16        (B) in the case of liability of a natural person for obtaining a consumer report under
false pretenses or knowingly without a permissible purpose, actual damages sustained by the
17     consumer as a result of the failure or $1,000, whichever is greater;

18        (2) such amount of punitive damages as the court may allow; and

19        (3) in the case of any successful action to enforce any liability under this section, the
costs of the action together with reasonable attorney's fees as determined by the court.

20                                \*    \*    \*

21     **(c) Attorney's fees**

22     Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in
connection with an action under this section was filed in bad faith or for purposes of harassment,
23     the court shall award to the prevailing party attorney's fees reasonable in relation to the work
expended in responding to the pleading, motion, or other paper.
24

25                                \*    \*    \*

26                                **ANALYSIS**

27     Class actions are governed by Federal Rule of Civil Procedure 23. A party seeking to certify a

28     class must prove that all the prerequisites of Rule 23(a) are met, as well as those of at least one

UNITED STATES DISTRICT COURT
For the Northern District of California

1    subsection of Rule 23(b) (and the relevant subsection here is 23(b)(3)). Fed. R. Civ. P. 23. The

2    following are the prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of

3    representation. A court may certify a class under Rule 23(b)(3) if the court finds that questions of law

4    or fact common to class members predominate over any questions affecting only individual members,

5    and a class action is superior to other available methods for fairly and efficiently adjudicating the

6    controversy. *See* Fed. R. Civ. P. 23(b)(3).

7        "Certification is proper only if the trial court is satisfied, after a rigorous analysis," that the

8    proposed class meets Rule 23's demands. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

9    "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"

10   *Id.* (quoting in part *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). This is because

11   "the class determination generally involves considerations that are enmeshed in the factual and legal

12   issues [constituting] the plaintiff's cause of action." *Id.* Still, "Rule 23 grants no license to engage in

13   free-ranging merits inquiries at the certification stage. Merits questions may be considered to the

14   extent – but only to the extent – that they are relevant for determining whether the Rule 23

15   prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133

16   S. Ct. 1184, 1194-95 (2013).

17       Beyond Rule 23's express demands, courts have implied an additional requirement under Rule

18   23(a): that the proposed class be ascertainable. *See, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d

19   583, 592-93 (3d Cir. 2012); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 671-72 (N.D.

20   Cal.2011); *see* Fed. R. Civ. P. 23(c)(1)(B) ("[a]n order that certifies a class action must define the

21   class and the class claims, issues, or defenses"). This preliminary requirement asks whether the class

22   is so defined that its individual members can be readily identified. A class should be sufficiently

23   definite and "clearly ascertainable" by reference to objective criteria "that it is administratively

24   feasible to determine whether a particular person is a class member." *Shepard v. Lowe's HIW, Inc.*,

25   No. C 12-3893 JSW, 2013 WL 4488802, *2 (N.D. Cal. Aug. 19, 2013).

26       If the class proponent meets his or her burden under Rule 23, then the court has broad discretion

27   to certify the class. *Zinser v. Accuflix Res. Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d

28   1266 (9th Cir. 2001).

UNITED STATES DISTRICT COURT
For the Northern District of California

# I. ASCERTAINABILITY

The defendants challenge the class definitions on the ground that the classes are not ascertainable because (A) the "accuracy class" cannot be defined by reference to objective criteria and instead inaccurate information (in the form of an inaccurate "alert") can be shown only by examining files individually, and (B) cross-referencing SmartMove and Trans Union, LLC lists will not necessarily produce a list of "disclosure"class members who requested a file disclosure, and even if it does, the list will contain people who may or may not be entitled to their files (for different reasons), which renders the class definition too broad. (Opposition, ECF No. 69-5 at 27-29, 43-45.)

## A. Accuracy Class

The defendants acknowledge that they have identified approximately 11,000 consumers (at least 8,000 in the class period) who were the subject of a SmartMove report with at least one "alert", but they point out that a customer is aggrieved (and thus part of the "accuracy" class) only if the "alert" is false. (*Id.* at 44.) Limiting the class definition to members who were tagged with "inaccurate" alerts does not fix the problem because (for example) an "inaccurate" alert cannot be established by reference to objective criteria and instead requires proof on a class member-by-member basis. (*Id.*)

The issue of accuracy is a core issue for ascertainability and the predominance of common issues. The defendants' fundamental quarrel is with the plaintiff's assertion that tagging the class members as (for example) "terrorists" (via the name-only logic) is always inaccurate and thus is enough to define the class (and establish the predominance of this common issue). The defendants counter that the plaintiff cannot show, except file by file, that the SmartMove reports wrongly tagged the class members as terrorists. They complain that the plaintiff cannot just assert that the terrorist tags were inaccurate and then shift the burden to the defendants to prove that the tags were accurate.

Normally, the defendants would be right. But this case presents a peculiar situation. The defendants' implied argument is that a significant number of the proposed class actually may have been accurately tagged as potential terrorists. Absent some pretty significant proof to the contrary, the court is willing to assume that no significant (read: certification-breaking) fraction of the tagged proposed class was in fact accurately tagged as potential terrorists. The backdrop question is — as it was in *Ramirez v. Trans Union, LLC* — whether the name-only logic ensures the maximum possible

1    accuracy of reports. *See* 15 U.S.C. § 1681e(b); *Ramirez*, 301 F.R.D. 408 (N.D. Cal. 2014). The

2    (undisputedly) problematic name-only logic and the sheer number of hits makes the court's approach

3    tolerable unless, again, the court is to start from the working assumption that a predominant number

4    of class members tagged with alerts, based on their names only, were in fact accurately tagged as

5    potential terrorists. The court elaborates on this point in the section on common-issue predominance.

6         The defendants also argue that the variations in the "headings" during the class period defeat

7    ascertainability: (1) "Terrorist" until August 2012; (2) "Potential OFAC Hit" after that; (3)

8    "Terrorist" again at some point before July 2013 until October 2013; and (4) "Potential OFAC Hit"

9    until December 2013. (*See supra* Statement, discussing Colaprete Decl., ECF No. 70-3, ¶¶ 5-10.)

10   They analogize the name differences to rolling label changes on food products that preclude class

11   certification based solely on a class member's self-identification as a purchaser of a product.

12   (Opposition, ECF No. 69-5 at 43, citing *Bruton v. Gerbert Prods. Co.*, No. 12-cv-02412-LHK, 2014

13   U.S. Dist. LEXIS 86581 (N.D. Cal. June 23, 2014).) The holding in *Bruton* was that a teeming

14   variety of baby-food labels made it infeasible for class members to "accurately recall" whether they

15   bought a product, and thus they could not self-identify into the class by affidavit. *Id.* at *1-2. But that

16   holding does not compel any result here. The Northern District regularly certifies small-ticket

17   consumer classes based on subjective self-identification in cases where the consumers' recall about

18   purchases is accurate. *See Brown v. Hain Celestial Grp., Inc*, No. 11-cv-03082 LB, 2014 WL

19   6483216, at *9-11 (analyzing cases). Moreover, this case is not about labels or header names: the

20   issue is the (in)accuracy of all the alerts, regardless of label. To extent that the *Bruton* analogy is even

21   useful, the court thinks that class members can accurately self-identify as to whether or not they are

22   terrorists. And as the court said at the hearing, there are methods (such as applying criteria beyond the

23   name-only matching logic) to winnow out less obviously false positives from the data set. When the

24   working assumption must be that a predominant number of the proposed class were *not* terrorists, the

25   court cannot accept "How can we find the positive hits in a field of 11,000" as blocking certification.

26   **B. Disclosure Subclass**

27        The defendants argue that cross-referencing SmartMove and Trans Union, LLC lists will not

28   necessarily produce a list of members who requested a file disclosure. (Opposition, ECF No. 69-5 at

UNITED STATES DISTRICT COURT
For the Northern District of California

1   27-28.) To support this argument, they say that the plaintiff's evidence is only about the Trans Union

2   Rental Screening Solutions database and not about Trans Union, LLC's actual database. (*Id.* at 21.)

3        When a defendant is in the business of collecting, analyzing, and arranging consumer data for sale

4   or on-demand retrieval, when it has already identified over 11,000 people with "alerts," and when all

5   tagged persons gave their contact information as part of the background-check process, the

6   defendants' argument that the class is not ascertainable is not convincing. The plaintiff also points out

7   that in *Ramirez*, Trans Union, LLC produced records of class members that Trans Union, LLC

8   associated with the OFAC list and who requested disclosures from Trans Union, LLC in a specified

9   time. (Reply, ECF No. 76-2 at 26 (citing *Ramirez*, 301 F.R.D. at 417).) Trans Union, LLC maintained

10  detailed records regarding consumer requests for file disclosures. (*See* Patel Request, ECF No. 56-28,

11  Ex. 16 to Motion). At the hearing, the plaintiff's counsel said that he will rely on these records.

12  Cross-referencing them to the SmartMove list will identify the "disclosure" subclass.

13       The defendants next contend that the disclosure class is overbroad because Trans Union, LLC's

14  obligation to provide a disclosure depends on whether the requester is entitled to it: a person might

15  fail to make a proper request, pay a required fee, or provide proper identification. (Opposition, ECF

16  No. 69-5 at 28-29.) In their reply, and as reflected in the modified definition in the Statement, *supra*,

17  the plaintiff refined the "disclosure class" definition from those who merely "requested" a file

18  disclosure to those who also were "sent" one. This eliminates the individual issues and solves any

19  problem with the class definition because the defendants presumably would not have sent a disclosure

20  unless the request was in order. It also resolves the similar argument that these individual issues

21  require an individual determination and defeat commonality. (*See* Opposition, ECF No. 69-5 at 32.)

22       Finally, the defendants argue that a consumer who has an alert on a SmartMove report might have

23  credit-only reasons for requesting a report from Trans Union, LLC (as opposed to the broader

24  background reasons implicated by the SmartMove report). That person is defined into the proposed

25  class and thus renders the class definition over broad. (*Id.* at 29.) The court disagrees. The point of

26  the lawsuit – discussed in more detail in the *Commonality* section below – is not the reason for the

27  request and instead is that the disclosure from Trans Union, LLC needs to include the full customer

28  file, including the background report with the "terrorist" alert. It is undisputed that the Trans Union,

UNITED STATES DISTRICT COURT
For the Northern District of California

1   LLC reports do not disclose the background report with the alert. (*See supra* Statement.)

2   **II. RULE 23(a) PREREQUISITES**

3       Rule 23(a) requires a class proponent to show four things: (1) the class is so numerous that

4   joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

5   (3) the claims or defenses of the representative parties are typical of the claims or defenses of the

6   class; and (4) the representative parties will fairly and adequately protect the interests of the class.

7   Fed. R. Civ. P. 23(a). These are usually termed the prerequisites of numerosity, commonality,

8   typicality, and adequacy. The court finds that the plaintiff has met all of the prerequisites to certify

9   both classes.

10      **A.   Numerosity — Rule 23(a)(1)**

11      The parties stipulated to numerosity. (ECF No. 56-31.) There is no dispute that the proposed

12  classes both are "so numerous that joinder of all members is impracticable." There is no absolute

13  minimum class size for establishing numerosity, but courts have held that classes as small as 40

14  satisfy the numerosity demand. *Delarosa v. Boiron*, 275 F.R.D. 582, 587 (C.D. Cal. 2011). The

15  defendants have identified over 11,000 persons with an "alert" on the SmartMove report (albeit for a

16  period that is slightly longer than the class period). (*See supra*.) The plaintiff has established that the

17  proposed classes each meet Rule 23(a)(1)'s numerosity requirement.

18      **B.   Commonality — Rule 23(a)(2)**

19      Under Rule 23(a)(2), a class cannot be certified unless the class proponent establishes that "there

20  are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). The named plaintiff need

21  not show that each class member's factual and legal issues are identical: "To establish commonality,

22  '[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common

23  core of salient facts . . . .'"  *Parra v. Bashas' Inc*., 536 F.3d 975, 978 (9th Cir. 2008) (quoting *Hanlon

24  v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998)). "Commonality requires the plaintiff to

25  demonstrate that class members have suffered the same injury. This does not mean merely that they

26  have all suffered a violation of the same provision of law."  *Dukes*, 131 S. Ct. at 2551. The common

27  question "must be of such a nature that it is capable of classwide resolution – which means that

28  determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* In that light, "even a single common question will do." *Id.* at 2556 (quotation and interpolation omitted); *accord Stockwell v. San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).

Commonality exists here. Several common questions define and drive this lawsuit. The most central questions include: (1) was there a disclosure?; (2) was the disclosure accurate?; (3) were there reasonable procedures in place (here, the name-only logic) to ensure the maximum possible accuracy of the information?; (4) did Trans Union, LLC control Trans Union Rental Screening Solutions sufficiently that it can be held liable for Trans Union Rental Screening Solution's conduct?; and (5) did Trans Union, LLC include the alert information when it sent disclosures to consumers who had "alerts" in the SmartMove reports?

The defendants nonetheless argue that a central question is whether each class member requested the "alert" information, and this is not susceptible to common proof. (Opposition, ECF No. 69-5 at 25.) For example, one consumer might want a SmartMove report, and another might know nothing about the report but instead wants a true credit report. (*Id.* at 25-26.) But the claim is not about the form of the request and instead is about Trans Union, LLC's failure to disclose "all information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a)(1). Of course, a request matters: there is no disclosure obligation without it. But it is the failure to disclose "all information" that is the claim here. It is undisputed that Trans Union, LLC did not disclose any alert information to anyone. This is a common issue.

The defendants maintain that it matters what the consumers request and cite out-of-circuit cases to support that conclusion. (Opposition, ECF No. 69-5 at 32-33 (citing *Taylor v. Screening Reports, Inc.,* 294 F.R.D. 680, 689 (N.D. Ga. 2013), and *Campos v. Choicepoint, Inc.,* 237 F.R.D. 478, 485-486 (N.D. Ga. 2006)).) These cases are different from this one.

In *Taylor*, the named plaintiff applied to rent an apartment, and the background check (prepared by a credit-reporting agency called SRI) listed felony convictions when he had none. *See* 294 F.R.D.

at 683. When the landlord rejected Taylor's application, it notified him that he had a right to obtain a copy of his "consumer report." *Id.* Thereafter, he sent a request for his "report" to SRI, and SRI disclosed the background report (with the criminal history) but not "all information" in the file. *Id.* The dispute in *Taylor* was whether requesting a "report" was synonymous with requesting the "file" (and thus whether SRI's practice of differentiating between the requests violated 15 U.S.C. § 1681g). *Id*. The court held that a consumer's general request for his "report" triggered an obligation to disclose all information in the file. *Id.* at 685. But because consumers could limit their requests to specific portions of the file (*e.g.*, a request for information leading to the adverse event as opposed to a general request by a curious consumer), the court denied class certification on the ground that Taylor (who asked for his entire file) was not typical of consumers who limited their requests to precise information. *Id.* at 685, 689.

*Campos* also involved a distinction between consumers who requested their files because they were curious about what was in them and consumers who requested their files after an adverse event. 237 F.R.D. at 481. The named plaintiffs were "curious" consumers. The *Campos* court certified the class only for "curious consumers" and denied certification for "adversely affected" consumers on the ground that the "curious" plaintiffs submitted evidence only about requests by "curious" consumers and did "not demonstrate[] that adversely affected consumers made similar requests." *Id.* at 485 (observing that it was reasonable to assume that "adversely affected consumers" would make substantially different requests targeted at specific information about the adverse event).

*Taylor* and *Campos* do not affect the analysis here. Trans Union, LLC did not tailor its disclosures to specific consumer requests. At least, there is nothing in the record to suggest that. (*See* Reply, ECF No. 76-2 at 15.) Instead, in response to consumer requests (whatever they were), Trans Union, LLC disclosed its complete file (in the form of a Trans Union, LLC credit report). The dispute is about Trans Union, LLC's failure to also disclose Trans Union Rental Screening Solution's file, meaning, the SmartMove report with the terrorist alert. The claim, in other words, has nothing to do with any unique characteristics of the various requests for disclosure;[5] it has to do only with the adequacy of

---

[5] The record does not suggest that consumers requested only part of their files.

the disclosure. That adequacy (again) does not turn on the consumer's request; it rests on Trans Union, LLC's position that it did not have to disclose more because Trans Union Rental Screening Solutions is a separate CRA. This, of course, is a central dispute in the case: are the defendants separate entities or do they operate as one?

This is a core dispute: whether Trans Union, LLC has sufficient control (to use a convenient word) over Trans Union Rental Screening Solutions so that under section 1681g(a)(1), it had to include the Trans Union Rental Screening Solutions background report (*e.g.*, the alerts) when it sent disclosures to consumers. That common question is resolvable by common proof, and the claim against Trans Union, LLC for the failure to disclose stands or falls on the resolution of it. The court cannot resolve it now: the facts are disputed, discovery is open, and the plaintiff has plausibly alleged that the Trans Union entities operate as one. (*See* Statement, *supra*, summarizing the parties' positions on the relationship of the entities.) For example, Trans Union, LLC markets the SmartMove product, and the SmartMove website tells consumers that they cannot get the SmartMove "credit report" and directs them "as an alternative" to the Trans Union, LLC website to get their Trans Union, LLC "credit report." (*Id.*) This is a disputed merits issue that will be decided after the class is certified. *See Brown*, 2014 WL 6483216, at *7-8 (discussing one-way intervention and the reasons for avoiding pre-certification merits rulings).

## C.  Typicality — Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the class representatives [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1011. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). "The purpose of the typicality requirement is to [en]sure that the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   interest of the named representative aligns with the interests of the class." *Id.* "[C]lass certification is

2   inappropriate when a putative class representative is subject to unique defenses which threaten to

3   become the focus of the litigation." *Id.* (citing cases).

4        The named plaintiff's claims are typical of the class's claims. He does more than allege "a

5   violation of the same provision of law." *See Dukes*, 131 S. Ct. at 2551. The conduct he challenges

6   was not unique to any plaintiff; rather, the plaintiff and the class suffer injury from the "same course

7   of conduct." *Hanon*, 976 F.2d at 508. There is moreover no real dispute that the named plaintiff is a

8   members of the class he would represent. *See*, *e.g.*, *Bautista-Perez v. Holder*, No. 07-cv-4192 THE,

9   2009 WL 2031759, at *8 (N.D. Cal. July 9, 2009) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S.

10  147, 156 (1982)). There appear to be no claims that the named plaintiff brings that class members

11  cannot bring, or vice versa.

12       The defendants' argument to the contrary is not persuasive. The defendants contend that Mr. Patel

13  is not typical because he requested only his credit report from TransUnion, that is what he got, and

14  that is all he was entitled to. (Opposition, ECF No. 69-5 at 21.) But this is the argument that the court

15  just rejected. The claim does not turn on what the plaintiff requested but instead turns on whether

16  Trans Union, LLC had to provide the alert information because it stands in Trans Union Rental

17  Screening Solution's shoes. Any steps that Mr Patel did or did not take to get the background report

18  from Trans Union Rental Screening Solutions are not relevant to this claim. (Reply, ECF No. 76-2 at

19  17-18 (affirming that the claims are about what Trans Union, LLC must disclose).) The claim is

20  typical of the class claims.

21       **D.  Adequacy — Rule 23(a)(4)**

22       Rule 23(a)(4) requires that, before a court may certify a class, it must find that "the representative

23  parties will fairly and adequately protect the interests of the class."  This requirement applies to the

24  class representative and class counsel and poses two questions: "(1) do the named plaintiffs and their

25  counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and

26  their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020. The

27  defendants do not dispute the adequacy of class counsel or the willingness of the named plaintiff to

28  vigorously prosecute the class's case. "Adequate representation is usually presumed in the absence of

1    contrary evidence." *Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249

2    F.R.D. 334, 349 (N.D. Cal. 2008).

3        ### 1.  *Adequacy of class counsel*

4        Rule 23(g) provides further guidance for assessing the adequacy of class counsel. Rule 23(g)(4)

5    restates the demand that class counsel "must fairly and adequately represent the interests of the

6    class." Under Rule 23(g)(1)(A), the court must consider the following criteria:

7            i.   counsel's work in identifying or investigating potential claims in the action;

8            ii.  counsel's experience in handling class actions, other complex litigation, and the types of

9                 claims asserted in the action;

10           iii. counsel's knowledge of the applicable law; and

11           iv.  the resources that counsel will commit to representing the class.

12   Rule 23(g)(1)(B) permits the court to "consider any other matter pertinent to counsel's ability to

13   fairly and adequately represent the interests of the class."

14       The court finds that class counsel is adequate in all these respects. They have extensive

15   experience in litigating similar cases (including *Ramirez* and *Cortez*), they have represented

16   consumer classes in many cases in many districts, they have shown their proficiency in this case, and

17   they acknowledge and accept their duties as class counsel. (*See* ECF No. 59-4 at 22-23.)

18       ### 2.  *Adequacy of the named plaintiff*

19       Rule 23(a)(4)'s adequacy requirement evaluates whether "the named plaintiff's claim and the

20   class claims are so interrelated that the interests of the class members will be fairly and adequately

21   protected in their absence." *Falcon*, 457 U.S. at 158, n.13. To this extent the adequacy, commonality,

22   and typicality prerequisites "tend to merge." *Dukes*, 131 S. Ct. at 2550-51 n.5.

23       The adequacy requirement is met here. The named plaintiff's claims share core common issues

24   with those of the unnamed class, and there are no "conflicts of interest" between the named plaintiff

25   and the absent claimants whom they would represent. The defendants' challenges mostly were about

26   the typicality of Mr. Patel's claim regarding the disclosure class, but the court rejected those

27   challenges and found that both claims were typical of the class's so that "the class claims [are] . . .

28   fairly encompassed by the named plaintiff[s'] claims." *Dukes*, 131 S. Ct. at 2550 (quoting *Falcon*,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

457 U.S. at 156). The defendants pick at Mr. Patel's characterizations of what he did and did not send to Trans Union Rental Screening Solutions, but (as the court held) his interactions with Trans Union Rental Screening Solutions are not relevant to the claims. The court does not think his clarification of his deposition testimony renders him an unfit representative.

### III.    RULE 23(b)(3) — PREDOMINANCE AND SUPERIORITY

In addition to proving the prerequisites of Rule 23(a), a plaintiff who seeks to certify a class must show that the proposed class meets the requirements of at least one subsection of Rule 23(b). Here, the plaintiff moves for certification under Rule 23(b)(3). To form a Rule 23(b)(3) class, the plaintiff must show two things: "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The predominance inquiry involves weighing and evaluating the common and individual issues in the case. *See Dukes*, 131 S. Ct. at 2556. It involves the same principles that guide the Rule 23(a)(2) commonality analysis, but it "is even more demanding than Rule 23(a)." *See Comcast*, 133 S. Ct. at 1432. The predominance inquiry looks at a suit's common questions, "focuses on the relationship between the common and individual issues," *Hanlon*, 150 F.3d at 1022, and requires the court to weigh the common issues against the individual issues. *See Dukes*, 131 S. Ct. at 2556. Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. *Hanlon*, 150 F.3d at 1022. Finally, predominance is not a matter of merely toting up common and individual issues; the inquiry is pragmatic and qualitative and focuses on whether common questions present the overriding issues in a suit. *See*, *e.g.* Newberg on Class Actions, § 4.51; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014) (single, central issue of liability supported a class action involving product defects; different specific defects and different damages could be handled by forming subclasses, by individual damages hearings, or in settlement negotiations).

The court finds that common issues of fact and law predominate and that the class device is the superior method of handling this dispute. The next two sections address these subjects in turn.

UNITED STATES DISTRICT COURT
For the Northern District of California

**A. Common-Issue Predominance**

Several central common issues drive this case, including the following:

• Was there a disclosure?

• Was the disclosure accurate?

• Were there reasonable procedures in place (here, the name-only logic) to ensure the maximum possible accuracy of the information?

• Did Trans Union, LLC control Trans Union Rental Screening Solutions sufficiently that it had can be held liable for Trans Union Rental Screening Solution's conduct?

• Did Trans Union, LLC include the alert information when it sent disclosures to consumers who had "alerts" in the SmartMove reports?

The defendants' arguments against finding common-issue predominance do not change this conclusion. The defendants' main argument is that the class members can prove the inaccuracy of the alerts only on an individual basis. The court rejected this argument in the section on *Ascertainability*: given the record, it is reasonable to infer at this stage that there is not a fraction accurately tagged as potential terrorists that destroys predominance.[6] *Accord Ramirez*, 301 F.R.D. at 422.; *see also Soutter v. Equifax Infor. Servs., LLC*, No. C 10-00107-REP, 2015 WL 1787236, at *6-8 (E.D. Va. April 15, 2015) (failure to report updated status of judgments does not require individualized proof).

To the extent that there are individual issues, they do not predominate over the several key shared issues that dominate this case. Nor do they create an impermissibly "overbroad" class. *See*, *e.g*., *In re Cathode Ray Tube (CRT) Antitrust Litig*., MDL No. 1917,  2013 WL 5429718, at *8-9 (N.D. Cal. June 20, 2013)( report and recommendation adopted 2013 WL 5391159 (N.D. Cal. Sept. 19, 2013).) ("[A] class will often include persons who have not been injured by the defendant's conduct but [this] . . . does not preclude class certification."); *Nat'l Fed'n of the Blind v. Target Corp*., No. C 06-01802

---

[6] The plaintiff notes that the burden for proving accuracy is not clear and it has shown enough. (Reply, ECF No. 76-2 at 23 (citing *Cortez*, 617 F.3d at 710).) In *Cortez*, the court addressed the different approaches that courts have taken in section 1681e cases to establish a triable issue for a jury, including shifting the burden to a defendant to show the reasonableness of procedures after a plaintiff shows an inaccuracy. *See* 617 F.3d at 710. The plaintiff's point is that the burden of proof is a merits issue, and it has shown enough for class certification.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    MHP, 2007 WL 1223755, at *3 (N.D. Cal. April 25, 2007) ("an over-inclusive class definition need

2    not defeat certification entirely.") If someone on the class list really is a terrorist, that person has no

3    claim, and the defendants will remain free to offer individual defenses.

4        The defendants nonetheless characterize *Ramirez*, which also found accuracy to be a predominate

5    common issue, as an outlier. (Opposition, ECF No. 69-5 at 37.) In particular, they quarrel with the

6    *Ramirez* court's grounding its conclusion on Trans Union, LLC's inability "to identify any instance in

7    which a person it identified as a 'potential match' was in fact a match." (*Id.* (citing 301 F.R.D. at

8    422).) The court understands the defendants' perspective, but the conclusion that *Ramirez* reached is

9    understandable. There was evidence before it, none of which showed a potential match. And the

10   backdrop question on this point – Did the system in place ensure maximally accurate results – is more

11   uniform, focusing as much on the nature of Trans Union, LLC's system as the discrete results it

12   reached. With that question hovering behind the individual matches, it makes sense that the *Ramirez*

13   court would decide that this can be handled on a predominately common basis.

14       To illustrate their conclusion of "outlier," the defendants cite FCRA cases that they say compel

15   the conclusion that "[t]he question of accurate attribution is necessarily individualized and precludes

16   a finding of both commonality and predominance." (Opposition, ECF No. 69-5 at 38-39 (collecting

17   cases).) Many of the cases involve the reporting of data that varies markedly by individual. This case

18   by contrast involves a terrorist alert that is demonstrably the result of the problematic name-only

19   logic. Again, absent some proof suggesting that a predominant part of the proposed class was in fact

20   accurately tagged as potential terrorists, the court cannot accept the defendants' argument that

21   accuracy here is largely an individual question.

22       In *Owner-Operator Indep. Drivers Ass'n, Inc.*, for example, the named plaintiffs were truck

23   drivers who challenged the gathering of their employment data by a provider called USIS. *Owner-*

24   *Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Servs., Inc.*, 537 F.3d 1184, 1186 (10th Cir.

25   2008). The Department of Transportation requires motor carriers to investigate drivers' employment

26   history and driving records before hiring them. *Id.* USIS sells a service to help motor carriers comply

27   with this requirement. *Id.* USIS compiles information from subscribing companies, who submit a

28   termination form when a driver leaves. *Id* at 1187. The form has 17 sections (such as "eligible for

rehire," "reason for leaving," and "work record"), and each section has several descriptions that employers circle if applicable. *Id.* The work-record section for example has 28 descriptors, including "superior," "outstanding," "excessive complaints," "cargo loss," "late pick up/delivery," and "failed to report accident." *Id.* The plaintiffs brought a section 1681e(b) claim, challenging USIS's failure to follow reasonable procedures to assure maximum possible accuracy in generating employment-history reports from the compiled information. *Id.* The district court concluded that the accuracy of each individual's employment history necessarily required a particularized inquiry. *Id.* at 1194. The court of appeals affirmed, finding no abuse of discretion. *Id.*

Other cases similarly involve data that is highly individual. *See Harper v. Trans Union, LLC*, No. 04-cv-03510, 2006 WL 3762035, at *8-9 (E.D. Pa. Dec. 20, 2006) (individual credit histories); *Pendleton v. Trans Union Sys. Corp.*, 76 F.R.D. 192, 197 (E.D. Pa. 1977) (same); *Farmer v. Phillips Agency, Inc.,* 285 F.R.D. 688, 703 (N.D. Ga. 2012) (criminal-history records). *Gomez v. Kroll Factual Data, Inc.,* 2014 U.S. Dist. LEXIS 51303, at *3 (D. Colo. Apr. 14, 2014), was a class-action challenge to OFAC alerts, and the district court there denied class certification. It did so without explaining its reasons, pointing only to the statement in *Owner-Operator* that "'[w]hether a report is accurate may involve an individualized inquiry.'" *Id.* (quoting *Owner-Operator*, 537 F.3d at 1194). On this record, the court has already concluded that whatever small fraction is accurately tagged as potential terrorists, it does not defeat common-issue predominance, especially because the defendants may offer their individual defenses.

Moreover, the court already found that the several variations in the label ("Terrorist" or "OFAC hit") do not change this result: the issue is the (in)accuracy of all the alerts, regardless of label. *Accord Ramirez*, 301 F.R.D. at 320. The defendants also point to the ability of subscribers to access additional information (ECF No. 69-5 at 44-45), but that ability does not impact accuracy given the court's conclusion that no certification-breaking fraction of the class is accurately tagged as potential terrorists. Whatever variations there are in the underlying records thus have no bearing on class certification.

In sum, *Ramirez* did not rely on inapposite authority or stand apart from what most courts have done in the same or similar areas. To the contrary, it drew upon Ninth Circuit law, and its reasons and

1   conclusions are straightforward and seem in no way like outlier logic. The court finds its reasoning

2   sound and follows it.

3   **B. The Class Action is the Superior Method of Handling This Dispute**

4   The other main prong of Rule 23(b)(3) requires a class proponent to show that the class action is

5   the superior method for adjudicating the dispute. Factors to be considered in weighing this question

6   include: class members' interest in individually controlling litigation; the nature of the litigation; the

7   desirability of concentrating the claims in one suit; and the likely difficulties in managing the class

8   action. Fed. R. Civ. P. 23(b)(3)(A)-(D); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir.

9   2013).

10   Considering these factors, the court has no difficulty concluding that a class suit is superior to

11   individual lawsuits. The defendants' main objection is that the issue of the alerts' accuracy is an

12   individualized determination, and it also disputes the appropriateness of class treatment for a case that

13   it says "has nothing to do with reports issued by Trans Union." (Opposition, ECF No. 69-5 at 4-5.)

14   The court has already addressed these objections. The defendants note that statutory attorney's fees

15   allow individuals to vindicate their claims, and they point to the modification of the alert procedures

16   in December 2013 (the end of the class period here). Neither detracts from the court's conclusion that

17   a class action is superior to individual litigation. *Accord Ramirez*, 301 F.R.D. at 423-24.

18   **CONCLUSION**

19   The court certifies the following class and subclass:

20   All natural persons residing in the United States who, from February 2012 until December
21   2013, were the subjects of Trans Union Rental Screening Solutions SmartMove reports
     containing at least one item of "Alert List" information.

22   All natural persons residing in the United States who, from February 2012 until December
23   2013, were the subjects of Trans Union Rental Screening Solutions SmartMove reports
     containing at least one item of "Alert List" information who requested a file disclosure from,
     and were sent a disclosure by, Trans Union, LLC.

24

25   This resolves ECF Nos. 56-4 and 60.

26   IT IS SO ORDERED.

27   Dated: June 26, 2015

28   _____
     LAUREL BEELER
     United States Magistrate Judge